[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage brought by the plaintiff wife against the defendant husband. The parties were married on October 17, 1981 in Easton, Connecticut. They have both resided in the state of Connecticut for more than one year prior to the date of this action. There are no children issue of this marriage. Neither party has been a recipient of public subsidy or assistance at any time. This is the first marriage for the defendant and the second for the plaintiff, her first having terminated in divorce.
The marriage has broken down irretrievably with no hope for reconciliation.
This is a marriage of some eight years between the plaintiff who is now 56 years old and the defendant who is 38 years old. At the time the parties met, the plaintiff was working as a freelance journalist in Israel and in France. She had also run a modeling agency.
While the evidence is somewhat unclear, it appears that after they met in New York, the plaintiff returned to Israel where she was working as a journalist. The defendant followed her to Israel and, apparently, proposed. The plaintiff indicated she wanted to stay in Israel, but he did not and so he returned to the States. Thereafter, she returned to the States and lived with him for a period of time until they decided to get married. It appears the defendant attempted to suggest that he was not that ready to get married but that the plaintiff, in effect, threatened to leave if he did not marry her.
At the time of the marriage, the defendant was working in night clubs in a rock band and delivering sandwiches for income. In addition, he had the income from a $100,000.00 trust fund set up by his grandparents. CT Page 902
Following the marriage, they lived for a time in Easton, Connecticut, renting a house there in which the defendant worked as a composer. While there is conflict in the testimony, the court finds that the plaintiff was the chief support of the parties for the first five or six years of the marriage together with the income from the defendant's trust fund. The defendant himself worked once as a limousine driver earning $10,000.00 in one year. The rest of the time he did no work outside of writing music which earned him no income.
Two years after the marriage, they purchased a condominium in Stamford in which they built a music sound studio on the lower level for the plaintiff to use to write his music. This purchase was made possible in part through $30,000.00 from his trust fund which was the down payment on the purchase. The condominium was purchased for $142,000.00. That is the major asset of the parties. It is presently valued by the one appraiser who testified at $230,000.00 to $235,000.00, and there is a mortgage on it of $150,000.00. (See exhibit 2.)
Up until 1988 when the income from the trust fund was exhausted, the marriage had its ups and downs. The plaintiff complained that the defendant was lazy and would not work outside of his music while she spent her time trying to promote his work on the one hand and earn income from various part time jobs on the other.
While the defendant claims his music business was his alone and not a joint business, the evidence contradicts that in the court's opinion. The accountant, for example, who testified for the defendant said that he met with both parties when he came to the house either to tell them how to get their records together for the purpose of making out an income tax or when he came to get those papers for the purpose of completing the tax. In addition, a trade name was filed with the Town of Stamford indicating that the business was a joint undertaking under a particular name. Moreover, there is evidence of stock having been issued in one of the various companies under which the defendant did his business, and the stock was issued in equal amounts to the plaintiff and the defendant.
Consequently, the court is convinced that the parties acted as partners throughout their marriage in the music business which was conducted by the defendant under a variety of names, to wit: Panorama Music Works, Musk Music, Inc., Musk Music to Picture.
In addition to working together, however, the parties developed in the course of time a rather strange relationship. CT Page 903 It appears that the plaintiff, perhaps concerned about the difference in the ages between them, suggested early in the marriage that her husband might want to have children by a younger woman. While she later denied this at one point in her testimony, this was contradicted by her testimony in her deposition. See exhibit 10. Furthermore, she did testify that she told the defendant some rather lurid stories of her prior experiences. She had been married before and had children by the prior marriage who are now grown. She had also lived with other partners from time to time and may have had a lesbian experience as well according to the somewhat questionable testimony of Wendy Heckler, a woman with whom the defendant is presently living.
Whether as a result of the plaintiff's suggestion or otherwise, a third party did enter the marriage in the person of Wendy Heckler, a married woman with children who is also a flutist with a master's degree in music. She began working with the defendant and became friendly with both the defendant and the plaintiff. In fact, she became so friendly that she would come to the house late at night in order to work with the defendant until the wee hours of the morning.
On the first of the occasions that she came to the house, according to the testimony of the plaintiff which was not contradicted by anyone else, she got into bed with the plaintiff and the defendant. Thereafter on other occasions, she had intercourse in the bed with the defendant while the plaintiff was in the bed (according only to the testimony of the plaintiff).
According to both the plaintiff and Ms Heckler, the plaintiff encouraged the relationship between Ms Heckler and both of them and, in fact, urged Ms Heckler to leave her husband because of the treatment Ms Heckler said she was receiving from him and her belief that he was a homosexual.
It seems to the court that the plaintiff, by the power of suggestion, in effect created the situation which came into being with her husband and Ms Heckler developing an intimate relationship which, in effect, excluded her not only sexually but also in the business. Ms Heckler performed with the defendant in concerts and also played some of his compositions. Her husband had, in the first place, contracted with the defendant to compose music for an enterprise in which he had an interest.
It also seems to the court that the situation which the plaintiff encouraged became, in effect, out of her control, and she found that she could not tolerate what she conceived to CT Page 904 be her exclusion by her husband and Ms Heckler.
In fact, the attitude of her husband and Ms Heckler is well illustrated by a note left for her by Ms Heckler, exhibit C.
In addition, it does appear that the end of the trust fund income had a deleterious effect on the total situation. Apparently one of the reasons that Ms Heckler was welcomed into the house was that she also provided money for the defendant's music business. Ms Heckler testified to loaning substantial sums and becoming a vice president in one of the defendant's corporations. This probably was the straw that broke the camel's back because from that point on the plaintiff was totally excluded from having anything to do with the music business. This occurred some time between 1988 and 1989. The separation, in fact, occurred when, after a fire on the premises, the plaintiff moved into the home of a friend of Ms Heckler's and the defendant elected to stay with Ms Heckler.
Since that time, the plaintiff on occasion did move back into the condo at one point and was, in effect, told by the defendant that he did not want her there so she moved out. She then tried to get back in by court order, and the court gave the defendant the option of either allowing her to come in and share the premises or pay her a $1,000.00 a month for living expenses plus pendente lite alimony of $125.00 a week. However, he elected to pay the $1,000.00 a month rather than have her come back into the house where he is presently living with Ms Heckler who has since obtained a divorce from her husband.
The cause of the breakdown appears to the court to be due to several factors. First, the bizarre nature of the relationship among the parties. Secondly, the age difference. Third, the relationship between the defendant and Ms Heckler. Four, because of a miscalculation on the part of the plaintiff of her ability to tolerate a menage a trois. However, the court does not find that anyone is at fault but that, in fact, all are in fault.
Plaintiff is seeking alimony of $125.00 a week for five or six years together with a share in the condominium and a share in the defendant's business for a period of six years. The defendant does not believe that any alimony should be paid or that she should obtain any share of the condominium or of the defendant's business.
It appears to the court that while the defendant did contribute to his own support and that of his wife while he was receiving income from his trust fund, the plaintiff also contributed her services as a wife, housekeeper and wage earner CT Page 905 from various small jobs as well as using the proceeds from the sale of a house she had in France for living expenses. Plaintiff also, it seemed to the court, did put a lot of effort in trying to get the defendant to work at his talent, that is, musical composition, and it was the two of them, together, who actually started the business and set up the studio in Stamford where he is presently working and living as part of the condominium which they purchased.
While it is true that the plaintiff did not contribute her equal share, which she had promised, of the money needed to carry the expenses of the condominium, she did work at the business and kept the house and also worked at part time jobs during some of the time that they lived in Stamford.
Further while the defendant claims in effect that not only is she not entitled to anything but in effect the defendant cannot afford to give her anything, that he owes more money than he has ability to pay, his tax returns as well as his financial affidavit seem to paint a different story.
In the first place, on the 1989 income tax return, exhibit 17, on schedule B, he lists interest from K-1's at $3,498.00 and from K-1 exempt of $4,041.00. Nowhere on his affidavit does the source of this income appear. In fact, he lists no income of any kind on his affidavit. He does, however, list expenses of $890.91 and liabilities of $67,619.00. On the face of it, his affidavit appears to be at least inaccurate.
While his income tax return indicates very little taxable income, that is the result of the deductions which include depreciation in the amount of $11,000.00 from his gross receipts of some $24,461.00.
In addition, the claim is that his business has little value. His September 11, 1990 affidavit lists the value of his business at $30,000.00. However, he has insurance on the equipment which he uses which values the equipment at $40,000.00 for a computer, hardware and $4,225.00 for software plus $25,211.00 for his other equipment. See exhibits I and J. Furthermore, on his 1989 tax return, exhibit 17, he valued his equipment at a total of $61,075.00. Consequently, the court must conclude that the business has assets equal to a minimum of $60,000.00. In addition, the business has, of course, his talent as its chief asset which is difficult to measure.
In fact, neither side offered any credible evidence of the value of the business. There was an appraisal of the value of the condominium, however, which estimates the value at $220,000.00. Since there is a mortgage of $150,000.00 on the CT Page 906 property that would leave a total equity of $70,000.00.
The 1989 tax return also indicates defendant added equipment in the amount of $5,922.00 to his business in 1989. See exhibit 17, schedule C.
Given the discrepancies in the defendant's affidavit when contrasted or compared with his tax return, the two solid figures on which the court may rely is the appraisal of the real estate with the outstanding mortgage of $150,000.00 and the value which the defendant has given his equipment of $61,000.00. Two other figures which appear to be credible are the taxable interest income of $3591.00 and the tax exempt interest of $4,041.00, both listed on his 1989 income tax return but neither of which appears on his affidavit.
The plaintiff, on the other hand, lists an income of $150.00 a week in a temporary, part time job. She appears to be living with and on the largesse of friends and does not appear to be making any effort at all to obtain more gainful employment. Given her background of having been a journalist, a waitress, manager of a modeling concern and given her appearance and command of the English language, it would appear to the court that there is no good reason why she cannot get a job for any more than the $150.00 a week she alleges. The court also feels that she has vastly over estimated the defendant's financial situation and perhaps was misled by the fact that he had income from a trust fund at the time she married him. Now that that is gone, what is left is considerably less than what she apparently expected.
There was an initial claim by the defendant that the parties are governed by a "post nuptial agreement." (See exhibit 2.) Since the only consideration would appear to have been the marriage and the marriage had taken place before the agreement was executed, there would appear to be no consideration warranting the enforcing of that agreement. Consequently, the court finds that the agreement is unenforceable.
Given the financial situations the court has found and after considering all of the elements of 46b-81 and 46b-82, the court finds as follows:
1. The parties were married in Connecticut in 1981 and were separated in 1989. The plaintiff is 56 years old and the defendant is 38 years old.
2. Both parties have lived in this state for more than one yea preceding the bringing of this action. CT Page 907
3. There are no children issue of this marriage.
4. Neither party has been the recipient of state aid or federal aid. All the necessary affidavits have been filed, and the court, therefore, has jurisdiction.
5. The marriage has broken down irretrievably with no hope of reconciliation, and it is hereby dissolved.
6. The defendant shall pay the plaintiff the sum of $150.00 a week alimony for a period of eight (8) years or until her death, remarriage or cohabitation within the meaning of the Connecticut statutes, whichever first occurs.
7. The condominium shall be sold as has been previously ordered, and after payment of the outstanding mortgage, taxes, attorneys' fees for the closing and closing costs, the net proceeds shall be divided as follows: fifty-five (55%) per cent to the plaintiff and forty-five (45%) per cent to the defendant. Any arrears in the payment of taxes, mortgage or interest shall not be included in determining the net proceeds which the parties are to share in the proportion hereinbefore set forth. Instead they shall be deducted from the defendant's share at the time of the closing.
 To effectuate the sale, the parties shall agree on a qualified real estate broker to set the listing price. If they cannot agree within two weeks of the entry of this judgment, each shall select a broker and the two brokers so selected shall choose a third who shall determine the listing price. The parties shall accept any firm offer to purchase that is within five (5%) per cent of the listing price.
 Pending the sale, the defendant shall be responsible for the maintenance of the condominium as well as the taxes and mortgage, and he shall retain exclusive possession thereof.
 The parties shall each be responsible for all federal or state tax liabilities by way of capital gains arising out of the sale of the condominium in the proportionate share which each has been awarded herein. The defendant shall indemnify and hold the plaintiff harmless against any and all claims, costs or expenses arising out of his failure to pay the expenses of the condominium including the taxes, the mortgage and the maintenance as set forth above.
CT Page 908
8. The defendant shall retain ownership of all the equipment used in his business, and the plaintiff shall relinquish any right, title or interest she may have therein.
9. Prior to the sale of the condominium, the parties shall agree on a third party to view the premises, make an inventory of the contents and seek to allocate the items of furniture and personal effects equally between the parties. Failing an agreement by the parties on a person to do this or on a final agreement, the matter may be referred to the Family Services Division, and the court will retain jurisdiction in order to effectuate any recommendation of family relations.
10. The 1985 Honda shall belong to the plaintiff and the 1975 Dodge van shall be the property of the defendant. Each party shall sign the necessary papers to accomplish this result.
11. Each party will pay his or her own liabilities listed on his or her affidavit and his or her attorney's fees. It is so ordered.
MARGARET C. DRISCOLL STATE TRIAL REFEREE
CT Page 908